Krupp, Peter B., J.
Plaintiff Shawn D’Amato (“D’Amato”), a Massachusetts State Police officer for more than two decades, seeks review under G.L.c. 249, §4, of a decision by the Massachusetts Department of State Police Rating Board (the “Board”), which denied him disability retirement under the so-called “Heart Bill,” G.L.c. 32, §94.
Under G.L.c. 32, §26, a State Police officer is entitled to disability benefits if the officer is likely permanently disabled due to either an “illness incurred through no fault of his own in the actual performance of duty,” or “an injury . . . during the performance and within the scope of his duty and without contributory negligence on his part.” (Emphasis added.) The Heart Bill, G.L.c. 32, §94, creates a gloss on this statute when the disability is “caused by hypertension or heart disease.” Specifically, the Heart Bill creates a rebutta-ble presumption that the officer’s cardiac condition was “suffered in the line of duty, unless the contrary be shown by competent evidence,” provided that the officer “successfully passed a physical examination on entry into such service, or subsequently successfully passed a physical examination, which examination failed to reveal any evidence of such condition.” Id. In this case, the Board found the Heart Bill’s presumption rebutted because “competent evidence . .. shows that [D’Amato’s] cardiac condition is, by a preponderance of the evidence, due to excessive use or abuse of alcohol” based on a finding that D’Amato had “a history of long-term alcohol use/abuse.”
*557 The case is before me on cross motions for judgment on the pleadings. D’Amato seeks review of the Board’s finding that the Heart Bill’s presumption was rebutted, challenging both the factual finding that he had a “history of long-term alcohol use/abuse” and the conclusion that his cardiomyopathy was “due to” his alcohol use.
For the reasons that follow, plaintiffs motion is ALLOWED, defendants’ motion is DENIED, and the court reverses the Board’s decision.
BACKGROUND
Because the Board found D’Amato’s alcohol use to be the cause of his cardiac condition, I set out the facts from the administrative record bearing on the Board’s finding, with a particular focus on alcohol use.
When D’Amato entered the Massachusetts State Police Training Academy in 1994, he had no history of cardiovascular disease. On February 2, 2001, while attempting to arrest a suspect, the suspect fired “a Tazer-type stun gun” against the left side of D’Amato’s chest. After reporting that his heart was racing, D’Amato was brought to Emerson Hospital. He was admitted with an elevated heart rate and an electrocardiogram (“ECG”) that showed sinus tachycardia and nonspecific T-wave changes. D’Amato was discharged the next day. A medical provider at Emerson Hospital noted “no evidence for arrhythmia presently or cardiac damage.”[3]
On February 6, 2001, D’Amato was seen by Massachusetts General Hospital (“MGH”) cardiologist Richard Liberthson, M.D., who ordered a 24-hour Holter monitor and an echocardiogram. The Holter monitor results were normal and an echocardiogram on February 26, 2001 showed a slightly dilated left atrium and hypokinesis (diminished heart motion) of the inferior heart including the inferior septum. D’Amato’s left ventricular ejection fraction (“LVEF”) was normal at 59%. In March 2001, D’Amato underwent another echocardiogram, which was normal and showed no wall motion abnormalities as had been previously seen. Another 24-hour Holter monitor in April 2001 was normal and a nuclear exercise stress test in May 2001 was negative for ischemia, infarction, or any other abnormalities. State Police Surgeon Brian Morris, M.D., MPH, examined D’Amato on May 15, 2001. At that time, an ECG was normal, D’Amato was asymptomatic, and Dr. Morris cleared D’Amato to return to full duty.
Every other year from 2003 to 2013, D’Amato was seen for a Retention Examination. These exams were unremarkable other than for borderline hypertension, elevated cholesterol, and elevated triglycerides.
On November 25, 2013, while off-duty, D’Amato crashed his personal vehicle into a parked Massachusetts State Police cruiser at approximately 50-60 miles per hour while intoxicated. D’Amato was found sitting outside the car when EMS arrived. EMS reported that D’Amato endorsed the use of cocaine, but D’Amato denied this at MGH and a subsequent urine screen for cocaine was negative. D’Amato admitted to the use of alcohol. At MGH, D’Amato’s blood alcohol level was measured at 0.34, more than four times the legal limit of 0.08. According to the social history documented at MGH, D’Amato “endorse[d] social drinking, moderate intake R 5 days/week with occasional binge drinking.” The MGH records indicate that D’Amato was “unable to be discharged due to persistent tachycardia thought to be related to ETOH w/d [alcohol withdrawal]” and was admitted to the hospital for treatment of alcohol withdrawal. During his admission, D’Amato’s LVEF was 46%. The MGH records explain that the “[1] ikely etiology” of this LVEF result “is a prior cardiac event, no evidence of Qwaves on EKG, could have been an undiagnosed MI [heart attack] v. from previous stun gun injury in 2001. Also, Mr. Damato did endorse over-the-counter use of ephedra which could be driving cardiac injury. Unlikely alcoholic cardiomyopathy given localized injury.” (Emphasis added.)
D’Amato was discharged from MGH on November 27, 2013. The MGH discharge instructions explain his hospital course and recommend follow up as follows:
You were hospitalized for evaluation of tachycardia (elevated heart rate). There was concern for possible alcohol withdrawal so you were treated with benzodiazepines to prevent complications related to withdrawal. We do not feel that you ever had evidence of withdrawal It is possible that stress is adding to the cause of the high heart rate. We treated you with IV fluids to treat your dehydration, but the heart rate did not improve dramatically. The ultrasound of your heart showed some dysfunction of your left ventricle, which could be related to a prior event (like a prior unidentified heart attack), your supplement use, or related to your alcohol use (less likely) . . .
We strongly encourage you to stop using the oxyE-lite Pro and the ephedra. Ephedra has been related with cardiac death, especially in a heart that is not functioning to it’s [sic] full capacity. Please STOP using these pills . . .
We also strongly encourage you to stop drinking alcohol. Alcohol effects the whole system and your health. We would recommend that you consider attending AA meetings if you feel that you need assistance stopping. (Emphasis added.)
D’Amato was suspended without pay following the November 2013 incident. On July 16, 2014, Russell Vasile, M.D., a psychiatrist, evaluated D’Amato to determine his fitness for duty. D’Amato reported to Dr. Vasile that on the evening of the incident, he had been watching a Patriots football game at home, decided to join friends at a local bar to celebrate the game’s outcome, and “[h]is judgment was markedly impaired as he had been drinking heavily that night including at least 5-6 glasses of wine along with several shots of *558 Vodka.” D’Amato said “he had been drinking heavily for at least one week leading up to the accident. He stated this was unusual for him. He had been stressed by plans for an impending sale of his home and a purchase of another new home” and related family issues. In his discussion with Dr. Vasile, D’Amato “denied a chronic pattern of alcohol abuse and asserted that the drinking pattern in the week prior to the accident was an aberration for him.” Instead, D’Amato “reported that his typical drinking pattern over the years was to drink wine socially, generally 2-3 glasses of wine twice weekly.” D’Amato reported that in December 2013 he had attended a 10-day program at the Brattleboro Retreat focused on recovery from alcohol abuse, and was participating in a 16-week court-required 24D program,[4] which required drug and alcohol testing, and was scheduled to complete the program in two months. D’Amato reported “that his last drink was in March 2014 and that he is now committed to full abstinence from alcohol.”
In January 2014, D’Amato underwent additional medical testing at the order of his cardiologist, Alena Goldman, M.D. The testing revealed an enlarged left ventricular chamber with mild hypokinesis and a below normal LVEF of 43%. A cardiac catheterization in February 2014 showed no significant coronary artery disease.
In the spring of 2014, D’Amato inquired about retirement under the Heart Bill due to his cardiac condition. On July 14, 2014, Dr. Morris examined D’Amato. At that exam, D’Amato provided Dr. Morris with two letters from James Brown, M.D., his primary care physician. The first letter dated April 24, 2014 concluded that D’Amato’s cardiac condition began after the stun gun incident and before the November 2013 car crash. The second letter dated June 10, 2014 expressed concern that D’Amato’s cardiac condition could lead to congestive heart failure or a dangerous cardiac rhythm and opined that D’Amato was no longer fit for duty.
On September 9, 2014, D’Amato began a cardiac rehabilitation program at MGH.
On September 22, 2014, Dr. Morris examined D’Amato again. At that exam, D’Amato provided Dr. Morris with a note from MGH cardiologist Malissa Wood, M.D., in which she opined that D’Amato had “evidence of a cardiomyopathy which has improved but is still greatly affecting [his] exercise tolerance.”
In connection with his request to retire under the Heart Bill, on August 12, 2014, D’Amato was also examined by cardiologist Jerold Weiner, M.D. Dr. Weiner’s original report, dated August 12, 2014, contained several significant factual errors (e.g., misstating that D’Amato had excess exposure to cocaine and describing the November 2013 accident as work-related), which he corrected in a revised report on or about November 7, 2014. Dr. Weiner’s revised report includes mention of D’Amato’s history of “excess exposure to alcohol” but does not link alcohol exposure to D’Amato’s heart condition. In his revised report, Dr. Weiner concludes:
My clinical impression is that the claimant may have suffered a stress cardiomyopathy syndrome, possibly from his prior exposure to dietary supplements, which would not be work-related, and thus developed moderate left ventricular dysfunction.
The motor vehicle accident he suffered in November of 2013, which also was not work related, may have caused an exacerbation of his left ventricular dysfunction which was documented by cardiac cathe-terization due to the trauma involved and stress involved. His disability would not be considered work related, as the conditions on which his disability is based resulted from non-worked [sic] related issues.
In a September 24, 2014 report summarizing D’Amato’s cardiac histoiy for the Board, Dr. Morris stated, in pertinent part, as follows:
The etiology of Tpr. D’Amato’s cardiac condition is unknown. It is unlikely to be due to the stun gun discharge. Stun gun discharges can produce abnormal, and rarely fatal, cardiac rhythms. But, stun gun discharges have not been linked to Tpr. D’Amato’s iype of long-term cardiac damage.
Alcohol may he a factor, but this usually produces a dilated cardiomyopathy, which Tpr. D’Amato does not have based upon his echocardiograms. (Emphasis added.)
Dr. Morris also concluded that “[o]ne cannot be certain of the role that dietary supplements have played in Tpr. D’Amato’s cardiac condition.”
After a meeting on October 21, 2014, the Board denied D’Amato’s petition for an accidental disability retirement, concluding that he did not qualify under the Heart Bill because “competent evidence showed that [D’Amato’s] cardiac condition was due to excessive exposure to alcohol and dietary supplements.”
In May 2015, D’Amato filed a new application for accidental disability under the Heart Bill, submitting a March 26, 2015 letter from his treating cardiologist, Dr. Wood, regarding the possible causes of D’Amato’s cardiomyopathy. Dr. Wood opined:
In this situation the exact cause of his heart muscle weakness is hard to determine but given the area of weakness noted in 2001 it is very likely that he sustained some heart injury at that time. Mr. D’Amato reports only moderate alcohol intake to me in the past and this level of alcohol intake should not result in this degree of heart muscle weakness. Another cause apparently raised at the time of Mr. D’Amato’s hearing for his retirement on the heart bill was his prior use of Oxy-Elite and Ephedra. While these are associated with heart palpitations and rare sudden death, their association with heart muscle weakness is indeed quite rare. Other causes *559 of his heart muscle weakness include either a virus or what is known as “idiopathic” or cause unknown. Based on the above, I do not find there is competent evidence to support the idea that Mr. D’Amato’s heart muscle weakness was caused either by excessive exposure to alcohol or dietary supplements.
On June 12, 2015, Dr. Morris wrote to Dr. Wood, questioning the conclusions in her March 26, 2015 letter. He agreed that the dietary supplements in question “are generally not associated with heart muscle weakness,” but questioned Dr. Wood’s conclusions that the heart injury likely occurred after the 2001 stun gun incident, noting that “a repeat echocardio-gram from March 21, 2001 was completely normal” and the abnormalities previously seen after the stun gun incident were no longer present at that time. Dr. Morris also questioned Dr. Wood’s statement that D’Amato reported “only moderate alcohol intake,” something dietary guidelines define as no more than two alcoholic drinks per day. He suggested that D’Amato was more than just a “moderate” drinker based on D’Amato’s November 2013 MGH medical records indicating he was admitted for alcohol withdrawal, offered alcohol counseling, and advised to stop drinking alcohol; his attendance at a ten-day alcohol treatment program at the Brattleboro Retreat; and his admission that his last drink was not until March 2014.
When Dr. Wood did not respond to Dr. Morris’s letter, he called her on July 8, 2015. During the call, Dr. Wood declined to change her opinion regarding the lack of a causal link between D’Amato’s alcohol use and his heart condition.
On July 8, 2015, Dr. Morris submitted an addendum to his original September 24, 2014 report, updating his summary of D’Amato’s cardiac history, including his communications with Dr. Wood on July 8, 2015. His July 8 addendum concluded: “D’Amato’s cardiomyopathy may be due to one or more of the following factors: alcohol, dietary supplements, stun gun injury, viral infection. On the other hand, his condition may be idiopathic [cause unknown)." (Emphasis added.)
On July 14, 2015, the Board convened to consider D’Amato’s renewed disability retirement application. The memb ers of the Board were defendant State Police Lt. Colonel Sharon S. Costine, Alexandra Accardi, M.D. (a psychiatrist and State Surgeon with the National Guard), Shirish Desai, M.D. (Department of Public Health), and “silent member” Dr. Morris. During the proceedings, Dr. Morris opined that alcohol was “a causative factor in this case,” but would not go so far as to say alcohol caused D’Amato’s cardiac condition.[5] This opinion went further than Dr. Morris’s September 24, 2014 report, which identified the etiology of D’Amato’s cardiac condition as “unknown” and explained that D’Amato did not have the type of cardio-myopathy usually caused by alcohol, and his July 8, 2015 addendum, which stated that D’Amato’s cardio-myopathy “may be idiopathic” or “may be due to one or more of the following factors: alcohol, dietary supplements, stun gun injury, viral infection.”
On July 29, 2015, the Board issued its written decision denying D’Amato’s petition for disability retirement under the Heart Bill because D’Amato did “not meet the standards of a condition of impairment of health caused by hypertension and/or heart disease under the terms and conditions set forth in Chapter 32, Section 94 of the Massachusetts General Laws.” Specifically, the Board concluded:
competent evidence, overcoming the presumption created by M.G.L.c. 32, §94, shows that your cardiac condition is, by a preponderance of the evidence, due to excessive use or abuse of alcohol. More specifically, the Board finds that, despite representations of “moderate” alcohol use and the suggestion of a single instance of high-level intoxication, competent, credible evidence establishes a history of long-term alcohol use/abuse, that includes but is not limited to: (1) a reported blood-alcohol level of .34 immediately following your involvement in a November 2013 motor vehicle crash; (2) report(s) that you experienced alcohol withdrawal symptoms following hospitalization/treatment for the November 2013 crash; (3) your participation in alcohol treatment/counseling following the November 2013 crash and/or your prosecution for the crime of operating under the influence; (4) your continued consumption of alcohol, through at least March of 2014, in the wake of these events/circumstances; and (5) your previous admission(s) to and/or record(s) reflecting a history of regular “social drinking” and/or “occasional binge drinking.” (Emphasis added.)
D’Amato now seeks certiorari review of this decision under G.L.c. 249, §4.
DISCUSSION
I. Standard of Review
Because the Board’s decision was “essentially adjudicatory in nature,” under G.L.c. 249, §4, my review is limited to determining whether the decision is supported by substantial evidence in the administrative record. Durbin v. Board of Selectmen of Kingston, 62 Mass.App.Ct. 1, 5 n.7 (2004). “Under the substantial evidence test, the reviewing court is not empowered to make a de novo determination of the facts, to make different judgments as to the credibility of witnesses, or to draw different inferences from the facts; it cannot disturb a choice made below between two fairly conflicting inferences or views of the facts, even if it might justifiably make a different choice were the case before it de novo.” Id. at 6. “In order to be supported by substantial evidence, an agency conclusion need not be based upon the ‘clear weight’ of the evidence [ ] or even a preponderance of the evidence, but rather only upon ‘reasonable evidence.’ ” Lisbon v. Contributory *560 Ret. Appeal Bd., 41 Mass.App.Ct. 246, 257 (1996), quoting Medical Malpractice Joint Underwriting Ass'n of Mass. v. Commissioner of Ins., 395 Mass. 43, 54 (1985). See also, e.g., G.L.c. 30A, §1(6) (“ ‘Substantial evidence’ means such evidence as a reasonable mind might accept as adequate to support a conclusion”).
As noted above, see, supra, at 1-2, the Heart Bill creates a rebuttable presumption that D’Amato’s cardiac condition was “suffered in the line of duty, unless the contrary be shown by competent evidence.” G.L.c. 32, §94. This wording, as the Appeals Court found in interpreting a similarly phrased regulatory presumption, “requires not merely the introduction of some contradictory evidence in order to overcome the presumption, but rather that a ‘showing’ contrary to the presumption be ‘demonstrated.’ ” Yazbek v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 41 Mass.App.Ct. 915, 916 (1996). In Yazbek, the Appeals Court rejected the “bursting bubble” theory of presumptions where the operative regulation “provided that ‘[t]he presumptions [regarding whether a driver is at fault for an accident] . . . shall be considered determinative unless a showing to the contrary is demonstrated by the evidence presented’ at the hearing before the board.”[6] Id. at 915. Based on the regulatory language construed in Yazbek, the Appeals Court concluded that the regulation “requires... a ‘showing’ contrary to the presumption be ‘demonstrated.’ ” Id. at 916. The language of the Heart Bill’s presumption is comparable to the regulatory language establishing the presumption construed in Yazbek. Thus, to overcome the Heart Bill’s presumption that D’Amato’s cardiac condition was suffered in the line of duty, there had to be affirmative “competent evidence” showing that D’Amato’s cardiac condition was not suffered in the line of duly. See also, infra, at 17, n.ll.
II. The Cause of D’Amato’s Cardiac Condition
To rebut the Heart Bill’s presumption that D’Amato suffered his cardiac condition in the line of duty, there must be “competent evidence” to the contrary. G.L.c. 32, §94. As it relates to the Board’s findings, the question is whether the Board had competent evidence that D’Amato’s cardiac condition was caused by his alcohol use. This analysis requires two considerations: first, whether there was competent evidence that D’Amato had a history of long-term alcohol use or abuse; and, second, whether there was competent evidence that D’Amato’s heart condition was due to his alcohol use. I address each in turn.
A. Evidence of D’Amato’s Alcohol Use
In its decision denying D’Amato’s petition, the Board relies on five pieces of evidence to support its finding that D’Amato had “a history of long-term alcohol use/abuse.” The Board first cites to D’Amato’s blood-alcohol level of .34 following the November 2013 motor vehicle accident. The Board, however, had no competent evidence before it about the correlation between an elevated blood-alcohol level and a person’s prior alcohol abuse. During the July 14,2015 proceedings, Lt. Col. Costine mused that “(s]omeone whose blood alcohol level is a .34 is not someone who is an[ ] occasional drinker” and asserted that “[a] one-night person is not going to have ablood alcohol level of .34.” These sentiments assumed that someone with such an elevated blood-alcohol level must be a habitual alcohol abuser with a built-up tolerance to alcohol. Other than these generalized lay opinions by one Board member, there was no medical evidence or otherwise qualified opinion testimony regarding the correlation between a person’s blood alcohol level of .34 on one occasion and the person’s prior or habitual use of alcohol. Dr. Accardi appears to have recognized this deficiency. In response to Lt. Col. Costine’s opinions, Dr. Accardi stated that “(w]hat you need is an addiction specialist to sit on the Board.”
The single instance of a blood alcohol level of .34 is well-documented in D’Amato’s medical records, yet none of the medical professionals who examined D’Amato prior to the Board hearing pointed to that instance as evidence that D’Amato had an alcohol problem that had caused or contributed to his cardio-myopathy. While a blood alcohol level of .34 may be some evidence suggesting a possible prior history of alcohol abuse, it alone is far from adequate to support a factual conclusion that D’Amato had “a history of long-term alcohol use/abuse.”
The Board next cites “report(s) that [D’Amato] experienced alcohol withdrawal symptoms following hospitalization/treatment for the November 2013 crash.” There is no support for this finding, which is expressly contradicted by the MGH records from D’Amato’s post-accident hospitalization. The MGH records indicate D’Amato was admitted to MGH for treatment of alcohol withdrawal and treated with benzodiazepines out of concern for possible alcohol withdrawal. They go on to state plainly, however, that “[w]e do not feel that you [D’Amato] ever had evidence of withdrawal.” There is no other evidence of alcohol withdrawal outside of the MGH records. The Board’s factual finding of alcohol withdrawal in connection with D’Amato’s November 2013 hospitalization is therefore unsupported by the evidence.
The Board also points to D’Amato’s “participation in alcohol treatment/counseling following the November 2013 crash and/or [his] prosecution for the crime of operating under the influence” as supporting its conclusion that D’Amato had “a history of long-term alcohol use/abuse.” Neither event supports the conclusion. D’Amato participated in a 10-day program focused on recovery from alcohol abuse at the Brattleboro Retreat in December 2013 and was participating in a 16-week court-required alcohol program in July of 2014. These facts, however, do not reasonably lead to the conclusion that D’Amato had a lengthy history of alcohol use or abuse. Rather, they are the logical outcome of his arrest for driving under *561 the influence of alcohol and striking a parked State Police vehicle on November 25, 2013.[7]
The Board next cites to D’Amato’s “continued consumption of alcohol, through at least March of 2014, in the wake of these events/circumstances.” The events and circumstances to which the Board presumably refers are the November 2013 accident and D’Amato’s December 2013 attendance at the Brattleboro Retreat. Making a number of assumptions that are not supported in the record, the Board constructs a story of a man with a histoiy of alcohol abuse who causes an accident while driving under the influence and attends rehab to get help for his alcohol addiction, only to continue drinking months later. As explained above, D’Amato’s 0.34 blood alcohol level following the November 2013 accident and decision to attend a ten-day program at the Brattleboro retreat in the weeks after the accident do not, without more, reasonably support the conclusion that he had a long-term alcohol abuse problem that, having attended a rehabilitation program, should have kept him from having a drink in March 2014. There was no evidence of D’Amato’s level of alcohol consumption, if any, between the accident and March 2014 when he had his last drink.
The Board’s final piece of evidence supporting its conclusion that D’Amato had a “histoiy of long-term alcohol use/abuse” is D’Amato’s “previous admission(s) to and/or record(s) reflecting a histoiy of regular ‘social drinking’ and/or ‘occasional binge drinking.’ ” Following the November 2013 accident, D’Amato reported to MGH that he “endorses social drinking, moderate intake R 5 days/week with occasional binge drinking.” However, this statement does not reasonably lead to the conclusion that D’Amato was regularly an abuser of alcohol.[8] Notably, the medical professionals who treated and/or examined D’Amato in advance of the Board proceedings did not reach the conclusion that D’Amato’s alcohol use rose to the level of use or abuse sufficient to cause his heart condition.
In sum, although some of the Board’s findings are unsupported, the evidence before the Board was sufficient to support the ultimate finding that D’Amato had a histoiy of moderate alcohol use, with occasional binge drinking. This would support its finding of long-term alcohol use, but would not support a finding based on “competent evidence” that D’Amato had long abused, alcohol or regularly used it to excess.[9]
B. Evidence of a Causal Link
Even if the evidence before the Board supported the conclusion that D’Amato had a “histoiy of long-term alcohol use/abuse,’’ the evidence that D’Amato’s cardiac condition was caused by his alcohol use was insufficient to rebut the Heart Bill’s presumption that his condition was suffered in the line of duly.
The Board had no competent evidence before it that D’Amato’s cardiac condition was due to his alcohol “use/abuse.” At the hearing, the Board had various medical opinions about the cause of D’Amato’s cardiac condition available to it. None stated that D’Amato’s cardiac condition was caused by alcohol. The MGH physician who treated D’Amato following the November 2013 motor vehicle accident opined that the likely cause of D’Amato’s LVEF of 46% was a prior cardiac event (such as an undiagnosed heart attack or an injuiy related to the 2001 stun gun incident) or D’Amato’s Ephedra use, and that it was unlikely that the etiology was alcoholic cardiomyopathy. Dr. Weiner (an independent cardiologist) did not link D’Amato’s alcohol use to his cardiac condition and opined that D’Amato’s condition may have been caused by his use of dietaiy supplements or the November 2013 motor vehicle accident. Dr. Wood (D’Amato’s treating cardiologist) opined that the evidence did not support the conclusion that excessive exposure to alcohol caused D’Amato’s heart condition and that the level of alcohol intake he reported should not result in the degree of heart muscle weakness present.[10]
Finally, Dr. Morris (State Police Surgeon) gave a variety of opinions. On September 24, 2014, he wrote that the etiology of D’Amato’s cardiac condition was unknown and that D’Amato did not have the type of cardiomyopathy usually caused by alcohol. On July 8, 2015, he reported that D’Amato’s condition “may be idiopathic” or “may be due to one or more of the following factors: alcohol, dietary supplements, stun gun injuiy, viral infection,” but he did not point to any particular cause. Finally, at the hearing on July 14, 2015, he testified that alcohol was “a causative factor in this case.” AR 199.
This last opinion by Dr. Morris, which causally linked D’Amato’s cardiac condition to his alcohol use, only indicated that alcohol was “a causative factor.” (Emphasis added.) Dr. Morris previously declined to reach even this limited conclusion about a possible causal link. Three other physicians, at least two of whom were cardiologists, either expressly opined that alcohol was an unlikely cause for D’Amato’s condition or attributed his condition to other, non-alcohol-related causes. Even disregarding the substantial other medical evidence and focusing just on Dr. Morris’ opinion offered at the hearing that alcohol was a causative factor, such testimony is insufficient to rebut the Heart Bill’s presumption. Merely because something is a “causative factor” does not show that it was the cause or even the predominant cause; or, in this instance, does not demonstrate that the cause of D’Amato’s heart condition was not “suffered in line of duty.” G.L.c. 32, §94. There frequently are multiple “causative factors” for a particular medical condition. Dr. Morris’ testimony did not establish that alcohol was a “but for” or proximate cause of D’Amato’s con *562 dition, or that D’Amato did not suffer his cardiac condition in the line of duty.
The defendants contend in their cross motion that the factfinder must apply the preponderance of the evidence standard in determining whether the Heart Bill’s presumption has been rebutted.[11] Applying this standard, and viewing the evidence of causation as a whole or even just focusing on Dr. Morris’ opinion testimony, there was insufficient “competent evidence” before the Board to rebut the Heart Bill’s presumption that D’Amato’s condition was suffered in the line of duty. The Board’s decision cannot stand.
ORDER
Plaintiff Shawn D’Amato’s Motion for Judgment on the Pleadings (Docket #9) is ALLOWED. Defendants’ Cross Motion for Judgment on the Pleadings (Docket #9.2) is DENIED. Judgment shall enter overruling the July 29, 2015 decision of the Massachusetts Department of State Police Rating Board with respect to plaintiffs retirement and directing plaintiff to be retired with disability benefits under the Heart Bill.

 While the Commonwealth’s memorandum and the State Police Surgeon’s report from September 2014 indicate this note was made when D’Amato was discharged on February 3, 2001, the medical records show the note originated with the admitting physician at 10:30 p.m. on February 2, 2001.

 G.L.c. 90, §24D, provides that a person convicted of or charged with operating a motor vehicle under the influence of alcohol “may if such person consents, be placed on probation for not more than two years and shall, as a condition of probation, be assigned to a driver alcohol education program as provided herein and, if deemed necessary by the court, to an alcohol or controlled substance abuse treatment or rehabilitation program or to both.” The exact reasons D’Amato attended the 24D program are not clear from the record.

 When D’Amato’s counsel asked Dr. Morris whether he would say to a medical certainty that alcohol was the cause of D’Amato’s condition, Dr. Morris responded: “I’d have to think about that. I’m not going to be put on the spot because I’m not on trial here.”

 Under the “bursting bubble” theory, “if evidence rebutting the presumption-dependent factual conclusion is introduced, the presumption disappears and the factfinder is left to decide whether that conclusion is to be inferred from the basic fact upon which the presumption was dependent, or whether to credit the rebuttal evidence.” Yazbek, 41 Mass.App.Ct. at 915 n.4.

 During the Board’s hearing, D’Amato’s counsel explained that D’Amato attended the December 2013 rehabilitation program on the advice of the attorney then representing him in the criminal proceedings arising from the November 2013 incident.

 The Board did not abuse its discretion by crediting D’Amato’s statements about his rate of alcohol intake made in the course of medical treatment in November 2013 rather than his later statements that could be construed as minimizing his alcohol use.

 If this were the only issue with the Board’s findings, I would remand this matter to the Board for further consideration. However, because I find the evidence of a causal link utterly lacking, see, infra, at 15-17, remand would be unavailing and is therefore unnecessary.

 Notably, Dr. Wood maintained this opinion despite her knowledge that D’Amato attended an alcohol rehabilitation program in December 2013 and did not have his last drink until March 2014.

 See Defendants’ Opposition to Plaintiffs Motion for Judgment on the Pleadings and Cross Motion for Judgment on the Pleadings at 14 (Docket #9.2), citing Tessier v. Plymouth Cty. Ret. Bd., CR-94-892 at *9 (DALA Sept. 29, 1995) (‘To rebut the presumption [in G.L.c. 32, §94], it is necessary to produce competent evidence, the quantity and quality of which would prove the non-existence of the presumed fact is more probable than its existence”).